IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | Case No. 8:06CR194 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| CONRAD A. JASPER, | ) | |
| | ) | |
| Defendant. | ) | |

This case is before the court on the Motion to Suppress (#16) filed by defendant, Conrad A. Jasper. The motion was heard September 22, 2006 and the transcript of the proceeding (#25) was filed on October 18, 2006, at which time the motion was deemed submitted.

Jasper moves for the suppression of statements made by him to Omaha police officers on May 28, 2006 alleging the statements resulted from a combination of lies and false promises designed to overbear his will, in violation of his rights under the Fifth Amendment to the United States Constitution. The government counters that the tactics used by the police did not render the confession involuntary and that Jasper's statements were made after he received his *Miranda* warnings, acknowledged that he understood them, and agreed to speak with police.

**FACTUAL BACKGROUND**

Joseph E. Baudler testified he is a 17-year veteran of the Omaha police department. On May 28, 2006, while working in the gang suppression unit, he became involved in an investigation which was based upon information that an individual known as Dreads was going to deliver crack cocaine in the area of 40th and Ames (3:8-23).

After Baudler briefed Officer Mark Watson about the investigation, Watson placed a phone call to Dreads and struck a deal for the delivery of "a half a slice of pie or half a pie" (crack cocaine) to a parking lot at the Northeast corner of 40th and Ames (4:1-16). Based upon the earlier information Baudler was also aware that Dreads was described as a black male, about 6'2", weighing 180 pounds, wearing dread locks and driving a Chevy Malibu rental vehicle (4:19-21).

Surveillance was set up in a parking lot near 40th and Ames and shortly thereafter a person matching Dreads' description, driving a vehicle which also matched the earlier description, arrived at the scene (5:1-9). As officers pulled behind the vehicle, the vehicle sped off. At 30th and Hamilton the driver abandoned the vehicle and was involved in a foot pursuit with officers, which ended in the arrest of Jasper (5:14-24).

Jasper was transported to central police headquarters in a vehicle driven by Officer Mark Watson (6:9-14). However, prior to Jasper's arrival at central station, Baudler radioed Watson and advised him that police had found the half slice of pie. Baudler admitted that while police had not actually found narcotics, he wanted Jasper to believe that they had found the narcotics he was supposedly delivering (6:18-7:1).

Baudler testified that once he arrived at central police headquarters he initiated an interview with Jasper which began in the detention area and moved to an interview room. He explained that the interview was moved because the interview room had both audio and video equipment (7:7-18). Baudler estimated that the interview in the detention area lasted five to ten minutes (7:19-21) and was not recorded because no audio recording device was available (7:7-9). During the interview in the detention area, Baudler read Jasper his rights using an Omaha police department Rights Advisory Form (Ex. 1) (8:7-15). Baudler also

advised Jasper that police had found the narcotics and had enough to indict him.  Jasper responded that he had heard the dispatch that they had found the stuff and that he was willing to talk (10:18-24).

During his contact with Jasper, Baudler observed that Jasper was very calm, polite, and cooperative, had no difficulty understanding questions or statements and that he made no promises or threats to Jasper (10:5-17).  Baudler noted a video and audio recording (Ex. 2) was made of his contact with Jasper in the interview room, however the first ten minutes of the recording has static and the audio is hard to pick up (12:4-12).  Baudler estimated that the interview lasted two hours (13:5-6) and that Jasper never asked that the questioning stop, nor did he ask for an attorney (14:1-5).  Baudler noted he and Jasper got along "real good, just talking real casual, joking around at times."  (14:11-14).  Baudler admitted that he did tell Jasper that he would talk to the United States Attorney regarding his case in exchange for cooperation.  However, Baudler denied that he ever told Jasper that he would be released that night if he cooperated (33:15-34:5).

On cross-examination Baudler testified that his call to the Watson vehicle relaying the false information about the police finding drugs was not prearranged (15:1-5), but he did admit the purpose of the call was so Jasper would overhear it and believe the police had found drugs and to rattle him a little bit before the interview (15:16-16:5).  Baudler also admitted that he told Jasper the police had him on videotape selling drugs and had intercepted his calls using a wiretap (16:11-20).  Baudler admitted that when he made these statements to Jasper, he knew that they were false (17:25-18:4).

Conrad Jasper testified that on May 28, 2006 while being transported to the Omaha police station by Officer Watson, he heard a radio transmission that officers had found a

-3-

half a slice of pie and that Officer Watson then told him, "it looks like they found what you tossed." (23:2-12).  Jasper then asked Watson, "What kind of pie–pecan or cherry?" (23:13-17).

Jasper testified that at the police station, he asked Baudler what he was being charged with and Baudler told him he was being charged with delivery and conspiracy (25:2-11).  He stated that Baudler informed him that for a while Baudler did not know who he was, but that they had him on film making deliveries and that his calls had been intercepted (25:16-26:6).  Jasper stated that because he heard the radio transmission about finding the drugs and because he was informed he was on tape and his calls intercepted, that he decided to make a statement to Officer Baudler.  However, if he had known the true facts, that the information was false, he would not have cooperated (26:1-12).

Jasper also testified that while he and Baudler were going from the detention area to the interview room, it was determined that he would cooperate, make a controlled buy that evening (26:16-25), and that Baudler told him if he cooperated, he would be getting out (27:3-8).

On cross-examination, Jasper testified that he remembered being read his rights, however it was his understanding because of the "situation of cooperation" that the statement could be used against him if he failed to cooperate (28:8-13).  Jasper admitted joking with officers during the interview (29:14-18), however he disagreed that he voluntarily gave up his information because it would help him, stating that Baudler told him that Baudler would call the U. S. Attorney and see if he could get him out (29:19-22).

-4-

**LEGAL ANALYSIS**

The touchstone for the admissibility of a defendant's statements is voluntariness. *Brown v. Mississippi*, 297 U.S. 278 (1936). The court must look to the totality of the circumstances in determining whether or not the statements were voluntary. *Mincey v. Arizona*, 437 U.S. 385 (1978); *Colorado v. Connelly*, 479 U.S. 157 (1986); *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973).

"A *Miranda* warning must precede any custodial interrogation. A custodial interrogation involves questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *United States v. Chamberlain*, 163 F.3d 499, 502 (8th Cir. 1999) (citing *Miranda v. Arizona*, 384 U.S. 436 (1966)). However, "[i]nterrogation in the *Miranda* context refers to express questioning and to words or conduct that officers should know is 'reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Briones*, 390 F.3d 610, 612 (8th Cir. 2004) (*quoting Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). "*Miranda* does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers." *Butzin v. Wood*, 886 F.2d 1016, 1018 (8th Cir. 1989) (quotation omitted).

Regarding the statements Jasper made at the police station, I find that Jasper was advised of his constitutional rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).[1] There is no evidence that Jasper did not understand the advice of rights.

---

[1] On cross-examination, Jasper admitted that his rights were read to him (28:1-7).

Even though Jasper was advised of his *Miranda* rights, the court must examine the conduct of the law enforcement officials to determine whether or not there was an overreaching by law enforcement officials amounting to coercive police activity. In determining whether a defendant made statements voluntarily, the court must determine if the accused was coerced or his will was overborne. *United States v. Wilson*, 787 F.2d 375, 380-81 (8th Cir.), *cert. denied*, 479 U.S. 857 (1986). Coercive police conduct will render a confession inadmissible. *Blackburn v. Alabama*, 361 U.S. 199 (1960). Coercive police pressure is a predicate to the finding that a confession is not voluntary and violates the accused's due process rights. *Connelly*, 479 U.S. at 167. However, any police questioning has coercive aspects to it simply by reason of the confrontation. The police officer is part of the law enforcement system that will cause a charge to be made against a suspect. The questioning by a police officer, while uncomfortable, is not coercive *per se*. *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). The court must consider the totality of the circumstances, including the specific interrogation tactics employed, the details of the interrogation, and the characteristics of the accused. *Schneckloth*, 412 U.S. at 225-26.

"Trickery, deceit, even impersonation do not render a confession inadmissible, certainly in noncustodial situations and usually in custodial ones as well, unless government agents make threats or promises." *United States v. Kontny*, 238 F.3d 815, 817 (7th Cir. 2001) (citing *Frazier v. Cupp*, 394 U.S. 731, 739 (1969)); *see also Oregon v. Elstad*, 470 U.S. 298, 317 (1985) (citing *Frazier v. Cupp*: "[T]he Court has refused to find that a defendant who confesses, after being falsely told that his codefendant has turned

State's evidence, does so involuntarily."); *see generally* William E. Ringel, Searches and Seizures, Arrests and Confessions § 25:8, SSAC § 25:8 (Westlaw, July 2006).

I find the testimony of Officer Baudler to be credible, that Jasper was read his *Miranda* warnings from an Omaha police department Rights Advisory Form (Ex. 1), that Jasper understood his rights, and agreed to speak with officers. I have reviewed the videotape of the second portion of the interview (Ex. 2) and note that while the first eleven minutes are not audible, the remainder of the tape is consistent with the testimony of Baudler that Jasper was cooperative, congenial, relaxed, and in full control of his faculties. My review of the tape also shows no threats or promises were made and that the interview length of two hours is not particularly lengthy. My review of the circumstances surrounding the statement demonstrates that Jasper's will was not overborne and that while officers did misrepresent the evidence against Jasper, such tactics do not amount to coercive police activity.

## RECOMMENDATION

In summary, I find Jasper was read his rights, freely, voluntarily, knowingly, and intelligently waived those rights, and gave a statement to law enforcement.

For the above reasons,

**IT IS RECOMMENDED** to **Judge Laurie Smith Camp** that the defendant's Motion to Suppress (#16) be denied.

> Pursuant to NECrimR 57.3, a party may object to this Report and Recommendation by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten (10) days after being served with the recommendation. The statement of objection shall specify those portions of the recommendation to which the party objects and the basis of the objection. The objecting party shall file contemporaneously with the

statement of objection a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.

**DATED November 3, 2006.**

**BY THE COURT:**

**s/ F.A. Gossett**
**United States Magistrate Judge**